Kendrix M. EASLEY, Plaintiff,

v.

UNIVERSITY OF MICHIGAN BOARD OF REGENTS; Terry Sandalow, Dean of Law School; Theodore St. Antoine; Peter Westen; Beverly Pooley; Susan Eklund and Kris Munroe, jointly and severally, Defendants.

No. 84–CV–7560–AA.

United States District Court, E.D. Michigan, S.D.

Jan. 29, 1986.

Douglas L. Webster, Douglas L. Webster, P.C., Southfield, Mich., for plaintiff.

Doris M. Harker, Ann Arbor, Mich., for defendants.

## OPINION

FEIKENS, Chief Judge.

Kendrix Easley ("Easley"), plaintiff, seeks here to secure a Juris Doctor (J.D.) degree from the University of Michigan Law School over defendants' objection that he failed to earn the credit hours required for the degree. He brings this action under 42 U.S.C. §§ 1981, 1982, 1983, and the Constitution of the United States and alleges three causes of action.[1] First, he alleges that defendants deprived him of due process by revoking or withholding a J.D. without basis. For this cause of action, he seeks equitable relief, in the form of an injunction ordering defendants to award him a J.D. degree. Second, Easley alleges that one or more defendants seized personal papers from his briefcase during a Law School disciplinary hearing in violation of the fourth and fourteenth amendments to the Constitution. Third, Easley, a black man, alleges that defendants deprived him of his degree, seized his personal papers, and commenced disciplinary hearings against him because of his race in violation of the equal protection clause and 42 U.S.C. §§ 1981 and 1982. For his second and third causes of action, plaintiff seeks primarily damage relief. On August 19, 1985, I ordered a bench trial of plaintiff's equitable claim.[2] I have jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

## I. BACKGROUND

Easley commenced his studies at the Law School in the summer of 1979. In accordance with its policy to enroll a significant number of minority students (P. Ex. 9 at 86–87),[3] the Law School admitted Easley even though he had low law school admission test scores (D. Ex. 43, P. Ex. 12). He experienced difficulty in several courses, earning four grades of "D" or "D+," and one grade of "E" (S. Ex. 26). In his second term, Easley sought and obtained special arrangements from Associate Dean Eklund ("Eklund") regarding course requirements and scheduling of examinations. This pattern persisted throughout his law school career (D. Exs. 48–53). In the summer of 1982 he took the unusual step of petitioning the faculty to eradicate any reference in his transcript to the grade of "D+" in Taxation I, and to the grade of "D" in Enterprise Organization. That petition was denied.

Near the close of his law school career two disciplinary incidents took place. The first incident was triggered when he met with Professor St. Antoine ("St. Antoine") and attempted to improve his grade of "D" in the course entitled Employment Discrimination. St. Antoine raised the grade to a "D+" after reviewing the examination booklets. While returning the examination booklets to the files, St. Antoine noticed that a cover page of a booklet appeared to have been changed. He outlined the basis for his suspicion in a memorandum to Eklund (St. Antoine Deposition, Ex. 13), and ultimately brought a cheating charge against Easley. Because of this pending charge, Easley was not permitted to sit for the July, 1982 Michigan Bar Examination.

At about the same time, Easley submitted a paper to Professor Westen ("Wes-

---

1. Plaintiff originally alleged more than three causes of action, but in my August 19, 1985, Memorandum Opinion and Order, which I hereby incorporate by reference into this Opinion, I dismissed all except three claims. I also dismissed plaintiff's suit against the Regents of the University, with prejudice, 619 F.Supp. 418.

2. A bench trial was held on December 3, 6, 9, and 11, 1985. This Opinion constitutes the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

3. I cite stipulated exhibits with the abbreviation "S. Ex.," defendants' exhibits with the abbreviation "D. Ex.," and plaintiff's exhibits with the abbreviation "P. Ex."

ten"), presumably in an effort to earn one or two credit hours. *See infra* n. 12. When Westen examined the paper he discovered that it was a nearly complete copy of a Law Review article, and he charged Easley with plagiarism. Both charges were tried to a Law School Tribunal in accordance with its regulations. In November, 1982, Easley was found not guilty of cheating on his employment discrimination examination. In April, 1983, the Tribunal, chaired by Professor Wade McCree, found Easley guilty of plagiarism.

## II. THE DUE PROCESS CLAIM

Central to this dispute is Easley's claim that he was deprived of his J.D. degree. Although his pleadings do not make clear whether he is relying upon procedural or upon substantive due process, this is not critical to disposition of this case.[4] He cannot prevail under either theory without first proving his entitlement to a property interest protected by due process. *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (protection of procedural due process triggered only if plaintiff has a liberty or property interest); *Jeffries v. Turkey Run Consolidated School District,* 492 F.2d 1, 4 (7th Cir.1974) (absence of property or liberty interest fatal to substantive due process claim); *Levitt v. University of Texas at El Paso,* 759 F.2d 1224, 1231 (5th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985) ("[T]he substantive due process analysis is not triggered unless there is a property or liberty interest taken by state action."); *Kilcoyne v. Morgan,* 664 F.2d 940, 942 (4th Cir.1981), *cert. denied,* 456 U.S. 928, 102 S.Ct. 1976, 72

L.Ed.2d 444 (1982) (same); *Brenna v. Southern Colorado State College,* 589 F.2d 475, 476 (10th Cir.1978) (same); *Ryan v. Aurora City Board of Education,* 540 F.2d 222, 228 (6th Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977) (same).

Easley makes three arguments. First, he claims that he was entitled to six credit hours for his Civil Procedure course, but that defendants awarded him only five hours, leaving him one credit hour short of the eighty-one hours required for graduation. Second, he claims that he needed only eighty hours to graduate, not the eighty-one specified by applicable academic regulations. Third, he claims that the Law School actually conferred a J.D. upon him during Senior Day activities, and that defendants' subsequent actions revoked the degree.

### A. *The Credit Hour Controversy*

During the 1979 fall term, Easley enrolled in Professor Martin's Civil Procedure course, designated Course No. 502, Section 4, with five hours of credit (S. Exs. 11, 19, 28). Although Easley says he attended most of the semester's classes, he did not take the examination. Instead, he received permission from Eklund to defer it because of claimed family troubles. The deferred examination was originally scheduled for a date early in January, 1980 (D. Ex. 48). However, in January Easley requested another deferral, claiming continuing family difficulties.

Toward the end of the 1981 fall term, Easley discussed graduation requirements

---

**4.** In my August 19, 1985, opinion, I treated Easley's theory as one of substantive due process. Mem.Op. at 6. Because of the Supreme Court's recent decision in *Regents of the University of Michigan v. Ewing,* —— U.S. ——, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), I question whether I have authority to review, under substantive due process principles, the University's academic decisions at issue. In *Ewing,* the Court sustained a University's dismissal of a medical student who had a pattern of academic deficiencies. The Court prefaced its substantive due process analysis by stating that it would *assume* the

existence of a protected interest and dispose of the case on narrower grounds. *Ewing,* —— U.S. at ——, 106 S.Ct. at 511–12. As Justice Powell noted, the Court considered the existence of a protected interest "dubious." *Ewing,* —— U.S. at ——, 106 S.Ct. at 515–16 (Powell, J. concurring). Justice Powell, moreover, expressly disavowed the existence of a protected interest. *Ewing,* —— U.S. at ——, 106 S.Ct. at 515–16 (Powell, J. concurring).

Because of my ruling, I need not resolve this issue. I assume that *Ewing* does not preclude my review.

with Eklund and Kris Munroe ("Munroe"), the Law School Recorder. They informed him that he had to complete the Civil Procedure course before graduating. Eklund permitted him to satisfy the requirement by passing an examination to be given by Professor Martin.[5] Eklund originally scheduled the examination for a date in January, 1982, but later postponed it again, at Easley's request, to a date in March, 1982. Ultimately, Easley passed the examination.

Easley claims he earned six credit hours in Civil Procedure. He does not claim—and could not claim—that he ever enrolled in a six-hour Civil Procedure course.[6] Rather, he argues that Eklund promised him six hours credit. Eklund did not promise Easley six hours credit. She had no authority to make any such promise. Although she has limited discretion to determine the number of credit hours a student may receive for an independent study course, she has no authority to alter the number of credit hours given for an established course, such as Civil Procedure. Easley does not dispute this assessment of Eklund's authority. When a student takes and passes a make-up examination, it is standard law school procedure to give only the credit hours designated for the course. Easley took a make-up examination for a five-hour Civil Procedure course. (*Cf.* S. Ex. 30 at pp. 13-14).

Easley attempts to corroborate his claim by relying on the changes made on his transcript during the summer of 1982.

Professor Martin reported Easley's grade to the Law School Recorder on April 6, 1982 (S. Ex. 27).[7] Munroe's job as Recorder includes responsibility for entering reported grades into the Law School computer, which produces student transcripts. It is standard procedure to hold a grade reported during a semester until the end of the semester before entering it. Following that procedure, Munroe entered Easley's grade on June 22, 1982 (S. Ex. 27).

That entry consisted of both the grade and information as to the course graded. She entered the following information: Course No. 503, Section 4, Civil Procedure, and Professor Martin's name. She entered a "3" in the "hrs. load" column, and a "6" in the "hrs. graded" column. The entry contained obvious errors, which Munroe readily admitted in her testimony. First, during the 1982 Winter Term, Professor Cooper taught Course No. 503, Section 4 (S. Ex. 24). Easley did not take a course with Professor Cooper. Second, Easley's registration records for the term do not reflect enrollment in any section of Course No. 503 (S. Ex. 17). The Civil Procedure course that he took is known as Course No. 502. Although Munroe never corrected these errors, she changed the numbers in both the "hrs. load" and "hrs. graded" columns to "5." Easley argues that these changes prove that he earned six hours of credit in Civil Procedure, and that defendants wrongfully deprived him of one credit hour,[8] thereby preventing his timely graduation.[9]

5. Eklund permitted this because Easley had already attended classes for the course. This illustrates the concern Eklund displayed for him during his entire Law School program. The record shows that she did all within her authority to help Easley succeed in his quest for a law degree.

6. Six-hour Civil Procedure courses are offered, but they meet for two consecutive semesters and designate three hours credit for each semester. Easley enrolled in a one-semester, five-hour course (S. Ex. 11).

7. The date stamped on S. Ex. 27 is incorrect.

8. Easley claims that defendants deprived him of the hour so that St. Antoine could charge him with cheating. He argues that the University

would have had no jurisdiction over him if defendants had given him all the hours of credit he was due; thus, Easley claims, they took one credit hour away to prevent graduation and to permit a disciplinary hearing. Easley attempts to corroborate his theory by noting that Eklund and Munroe changed his transcript shortly after St. Antoine brought cheating charges against him.

The record does not support Easley's claim. First, the transcript matter and the cheating charge are completely separate events. Second, Easley produced no evidence supporting his claim that the cheating charge could go forward only after a reduction of one credit hour. Third, as I discuss below, Eklund and Munroe, in changing Easley's transcript, actually in-

9. See note 9 on page 584.

Easley's transcript never reflected six hours of earned credit for the Civil Procedure course. While the "hrs. load" column on the transcript is relevant to determining the credit hours a student has toward graduation, the "hrs. graded" column is not relevant to this determination. Even a cursory examination of Easley's transcript confirms this. If Easley wishes to rely for credit hours on the "hrs. graded" column, he could claim only sixty-six hours (sixty-seven hours if six hours are allowed for Civil Procedure), far short of the eighty-one hours required for graduation (S. Ex. 26). The original entry in the "hrs. load" column was a "3," not a "6," and the final entry in the column was a "5." [10] This change actually increased the number of credit hours recorded on Easley's transcript.

I find that neither Eklund, Munroe, nor any other University official, promised Easley six hours credit in Civil Procedure. I also find that Easley earned only five hours credit, and that this was all he was entitled to receive. I find that the Recorder originally erred by crediting Easley with only three hours credit, rather than the five to which he was entitled, and that this error

was ultimately corrected so that his transcript accurately reflected the eighty credit hours earned.

■ These findings compel the legal conclusion that Easley had no right at all, let alone a protected property interest, in a sixth credit hour. But even if Eklund had in fact promised him six hours credit for the course, he would still lack a protected property interest in the sixth hour. Easley argues that under *Roth, supra,* and *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), such a promise creates a property interest [11] protected by due process. In *Roth,* the Court stated:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. *Perry* held that this definition permits a plaintiff to establish a protected interest by proving "rules or mutually explicit understandings that support his claim of entitlement." *Perry,* 408 U.S. at 601, 92 S.Ct. at 2699. Easley argues that these cases

---

creased by two the number of credit hours reflected on the transcript.

9. Defendants have not barred Easley's access to a degree. Even now, he remains free to earn one more credit hour, thereby satisfying graduation requirements. Unfortunately, Easley has chosen to litigate.

Easley could have graduated on time, despite earning only five credit hours for Civil Procedure, if he had completed his three-hour independent study course with Professor Watson. Instead, he permitted his incomplete to mature into an "E," thus earning no credit for the course (S. Ex. 26). Even if he had completed an independent study for one or two credit hours, he could have earned sufficient credit hours to graduate. Easley considered an independent study with Professor Westen for one or two credit hours, but the paper he submitted led to his conviction of plagiarism. My only point here is that Easley passed by several opportunities to earn sufficient credit hours to graduate.

10. Eklund discovered the error while helping Munroe with her first degree audit. The Law School conducts degree audits to ensure that

candidates satisfy graduation requirements. If everything is in order, a candidate typically receives a diploma in the mail several months after finishing school.

Eklund discovered the error because of the three-hour discrepancy between the "hrs. graded" and the "hrs. load." For the entry to make sense, there would have to be a prior entry of three "hrs. load" and zero "hrs. graded." This two-entry method is used to record grades in two-semester courses, such as Easley's Property course (S. Ex. 26). In the case of plaintiff's Civil Procedure course, no prior entry accounted for the three-hour discrepancy. Accordingly, Eklund knew there had been an error.

11. In his Trial Brief, Easley argues that he had a liberty interest at stake, too. This claim is groundless. In denying Easley a sixth credit hour and a J.D. degree, defendants merely stated that he had not yet earned the hour or the degree. This does not "seriously damage his standing and association in his community." *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707. Easley remains free to earn one more credit hour, and thereby his J.D. degree.

transform Eklund's alleged promise into a constitutionally protected interest.

Easley's argument has no merit. It is not every subjective belief that creates a protected interest; *Perry* requires that an "understanding" have objective basis in a university's "policies and practices" of general application. *Perry*, 408 U.S. at 603, 92 S.Ct. at 2700–01, *quoting Sinderman v. Perry*, 430 F.2d 939, 943 (5th Cir.1970) (decision below). *See Grove v. Ohio State Unversity, College of Veterinary Medicine*, 424 F.Supp. 377, 383 (S.D.Ohio 1976) (no protected property interest in admission to veterinary school based upon encouraging statements from administrators and faculty where there was "nothing to support a conclusion that this was a consistent policy or practice of the institution to which an objective conclusion ... could be ascribed."). In *Perry*, the Court held that a non-tenured teacher could satisfy this burden by proving that school policies established a system of *de facto* tenure. The school had no formal tenure system, but its faculty handbook and promulgated guidelines assured "satisfactory" teachers a permanent position. *Perry*, 408 U.S. at 599–601, 92 S.Ct. at 2698–99. The Circuit Court cases that Easley cites (Trial Brief at 17) also involve written statements or established policies of general application.[12] In contrast, all Easley relies upon is his allegation that Eklund promised him six hours of credit. No policy or practice of the Law School provides an objective basis for his belief.

Under *Roth* and *Perry*, Eklund's promise, assuming it was made, does not create an entitlement protected by due process. Easley earned only five credit hours in Civil Procedure, and no promise can change

that. *Cf. National Consumer Information Center v. Gallegos*, 549 F.2d 822, 828 n. 6 (D.C.Cir.1977) (oral promise by director of public funding agency that plaintiff's program would continue to receive funding "cannot be said to elevate NCIC's funding rights to a constitutional status...."); *Shamie v. City of Pontiac*, 620 F.2d 118 (6th Cir.1980) (City's promise to provide plaintiff with reasons for denial of his application for an original liquor license did not create a protected property interest, even though the promise was made a matter of court record, because an applicant in plaintiff's position in fact had no entitlement under state law to a statement of reasons for denial of his application).

In summary, I find that Easley was never promised six hours credit for Civil Procedure. I also hold that even if Eklund had promised him six credit hours, he would have no property interest protected by due process.

### B. *The Eighty-Hour Controversy*

As an alternative claim, Easley alleges that he has an entitlement to a J.D. degree because he needed only eighty hours to graduate. He basis this on a statement contained in the Law School Bulletin (1978–80), a descriptive catalog for prospective students, that no less than eighty hours are required for graduation (P. Ex. 9 at 65). Although Easley admits that Law School regulations applicable to his class require at least eighty-one hours of credit (S. Ex. 30 at 1), he argues that the regulations do not bind him because they went into effect for the first time during his first term at the Law School, and because he did not receive a copy of the regulations prior to beginning the term.

---

**12.** *Zimmerer v. Spencer*, 485 F.2d 176, 178 (5th Cir.1973), *quoting* decision below, (protected interest " 'under the policies and practices of the institution' "); *Ferguson v. Thomas*, 430 F.2d 852, 856 (5th Cir.1970) (protected interest under University's "prevailing practices"); *Moore v. Knowles*, 482 F.2d 1069, 1072 (5th Cir.1983) (remand for finding as to whether the "practices of the school" system justify finding a protected interest); *Stapp v. Avoyelles Parish School Board*, 545 F.2d 527, 532 (5th Cir.1977) (protected interest based on School System's letter stat-

ing that it considered principal "under contract and would release him only for 'urgent and unforseeable circumstances' "); *Soni v. Board of Trustees of the University of Tennessee*, 513 F.2d 347, 350 (6th Cir.1975), *cert. denied*, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976) (District Court's finding of a protected interest not clearly erroneous where " 'objective evidence' " supported plaintiff's expectation of continued employment).

Easley thus urges that I order a J.D. degree conferral.

Easley's claim is groundless and frivolous. Although he testified that he did not receive the regulations before he began school, I find that the regulations were distributed with other orientation material at the beginning of each term. Easley admits receiving at least some of the other material. The regulations are readily accessible throughout the year in the administrative offices of the Law School. It is significant that Easley did not testify that he never received the regulations during his program at the Law School.

More important, Easley's claim fails for the same reason his first claim fails: the objective reality is that Easley and all others subject to the academic regulations effective May 31, 1979, need eighty-one credit hours to earn a J.D. degree, and no representation to the contrary can change that. This is particularly true where the representation Easley relies upon is contained in a booklet that cautions:

> The information contained in this Bulletin is subject to change at any time. It is intended to serve only as a general source of information about the Law School and is in no way intended to state contractual terms.

P. Ex. 9 at 1. No one can reasonably rely on statements of academic regulations contained in such a Bulletin. Moreover, Easley never testified that he relied on the statement he quotes. Easley thus has no entitlement to a degree based upon eighty credit hours.

### C. *The Senior Day Controversy*

██ Easley also claims an entitlement to a J.D. degree based on his participation in the May 15, 1982, Senior Day ceremony of the Law School. He argues that the Law School conferred a J.D. degree upon him during the ceremony, and that defendants' subsequent actions revoked his degree. Easley relies upon a letter from Professor Pooley ("Pooley") as corroboration for his claim (P. Ex. 4). The letter, written by Pooley in his capacity as Chairman of the Committee on Professional Responsibility, offers Easley (through his attorney) a settlement of the St. Antoine cheating charge. In the letter, Pooley writes that if plaintiff pleads guilty to the charge, "[g]rant of the J.D. degree to Mr. Easley will be withheld until December 31, 1982." (P. Ex. 4). Easley argues that this letter shows he had already acquired his degree, or at least had done everything necessary to acquire it.

Again, Easley's argument is groundless and frivolous. The Senior Day ceremony is provided by the Law School as a formal gathering in honor of third-year (senior) law students and their families. No degrees are actually conferred, nor could they be. Since Senior Day takes place the day after final examinations, there is no time to determine semester grades. Accordingly, degree eligibility cannot be verified. Furthermore, the final award of a degree is up to the University Regents.

Pooley explained his purpose in sending the settlement offer to Easley's attorney. He did not imply that he personally had power to award or withhold a degree, or that Easley had satisfied all the requirements for a J.D. degree. Pooley assumed Easley's degree would be granted as offered only if Easley qualified for it. His purpose was to indicate that as a penalty for cheating, the degree would be suspended for a time beyond the date on which Easley would otherwise be entitled to it.

Easley did not receive a J.D. degree by taking part in the Senior Day ceremonies.

### III. DISPOSITION

For the foregoing reasons, I hold that plaintiff's equitable claim fails. Defendants may submit an appropriate order.